# 22-1780

*To Be Argued By*:
JASON RICHMAN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 22-1780

➤✦✦✦➤

IBRAHIM AKASHA ABDALLA,

*Petitioner-Appellant*,

—v.—

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

JASON RICHMAN,
HAGAN SCOTTEN,
  *Assistant United States Attorneys*,
    *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. The Offense Conduct . . . . . . . . . . . . . . . . . . 3

        1. The Akasha Drug-Trafficking
           Organization. . . . . . . . . . . . . . . . . . . . . . 3

        2. The Akasha DTO's Efforts to Import
           Tons of Heroin and Methamphetamine
           into the United States . . . . . . . . . . . . . 4

        3. Abdalla's History of Violence . . . . . . . . 7

        4. Abdalla's Post-Arrest Campaign of
           Corruption . . . . . . . . . . . . . . . . . . . . . . . 9

    B. The Conviction and Sentencing . . . . . . . . 10

    C. The Section 2255 Motion . . . . . . . . . . . . . . 13

    ARGUMENT:

POINT I—The District Court Correctly Determined
    that Abdalla Was Not Prejudiced . . . . . . . . . . . 16

    A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 16

        1. Standard of Review . . . . . . . . . . . . . . . 16

        2. Ineffective Assistance of Counsel Claims
           Generally . . . . . . . . . . . . . . . . . . . . . . . 16

ii

PAGE

3. Ineffective Assistance of Counsel Claims
Regarding Plea Agreements . . . . . . . .  18

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  19

POINT II— The District Court Did Not Abuse Its
Discretion in Declining to Hold a Hearing . . .  23

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  23

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

## TABLE OF AUTHORITIES

*Cases*:

*Armienti v. United States*,
234 F.3d 820 (2d Cir. 2000) . . . . . . . . . . . . . . 24, 25

*Bennett v. United States*,
663 F.3d 71 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 16

*Blackledge v. Allison*,
431 U.S. 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Boria v. Keane*,
99 F.3d 492 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 18

*Chang v. United States*,
250 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . . 23, 24

*Cullen v. United States*,
194 F.3d 401 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 18

iii

PAGE

*Farrington v. Senkowski,*
214 F.3d 237 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 19

*Gonzalez v. United States,*
722 F.3d 118 (2d Cir. 2013) . . . . . . . . . . . . . . . . 16

*Lafler v. Cooper,*
566 U.S. 156 (2012). . . . . . . . . . . . . . . . . 18, 19, 21

*Lee v. United States,*
582 U.S. 357 (2017). . . . . . . . . . . . . . . . . . . . . . . 20

*Milios v. United States,*
813 F. App'x 646 (2d Cir. 2020) . . . . . . . . . . . . . 24

*Missouri v. Frye,*
566 U.S. 134 (2012). . . . . . . . . . . . . . 18, 21, 22, 23

*Parisi v. United States,*
529 F.3d 134 (2d Cir. 2008) . . . . . . . . . . . . . . . . 17

*Phillip v. United States,*
804 F. App'x 91 (2d Cir. 2020) . . . . . . . . . . . . . . 24

*Puglisi v. United States,*
586 F.3d 209 (2d Cir. 2009) . . . . . . . . . . 19, 24, 25

*Purdy v. United States,*
208 F.3d 41 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 18

*Raysor v. United States,*
647 F.3d 491 (2d Cir. 2011) . . . . . . . . . . 19, 20, 23

*Rivera v. United States,*
716 F.3d 685 (2d Cir. 2013) . . . . . . . . . . . . . . . . 16

*Strickland v. Washington,*
466 U.S. 668 (1984). . . . . . . . . . . . . . 16, 17, 18, 19

iv

PAGE

*Strouse v. Leonardo*,
   928 F.2d 548 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 17

*United States v. Bent*,
   654 F. App'x 11 (2d Cir. 2016) . . . . . . . . . . . . . . 20

*United States v. Dye*,
   638 F. App'x 117 (3d Cir. 2015) . . . . . . . . . . . 15, 22

*United States v. Galanis*,
   759 F. App'x 88 (2d Cir. 2019) . . . . . . . . . . . . . . 23

*United States v. Gordon*,
   156 F.3d 376 (2d Cir. 1998) . . . . . . . . . . . . . . . . 18

*United States v. McCoy*,
   707 F.3d 184 (2d Cir. 2023) . . . . . . . . . . . . . . . . 22

*United States v. Reiter*,
   897 F.2d 639 (2d Cir. 1990) . . . . . . . . . . . . . . . . 17

*United States v. Simmons*,
   923 F.2d 934 (2d Cir. 1991) . . . . . . . . . . . . . . . . 17

*United States v. Workman*,
   110 F.3d 915 (2d Cir. 1997) . . . . . . . . . . . . . . . . 22

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . 13, 23, 24

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 22-1780

―――――――――

IBRAHIM AKASHA ABDALLA,

*Petitioner-Appellant,*

—v.—

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

―――――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――――

### Preliminary Statement

Ibrahim Akasha Abdalla appeals from an order entered on July 21, 2022, in the United States District Court for the Southern District of New York, by the Honorable Victor Marrero, denying Abdalla's motion to vacate his conviction and sentence under 28 U.S.C. § 2255.

On October 24, 2018, Abdalla waived indictment and consented to the filing of Information S12 14 Cr. 716 (VM) (the "Information"), in six counts. Count One charged Abdalla with participating in a conspiracy to manufacture heroin, knowing and intending that it would be unlawfully imported into the United States,

2

in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3), 960(b)(1)(A), and 963. Count Two charged Abdalla with participating in a conspiracy to manufacture methamphetamine, knowing and intending that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3), 960(b)(1)(A), and 963. Count Three charged Abdalla with manufacturing and distributing heroin, knowing and intending that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3), and 960(b)(1)(A). Count Four charged Abdalla with manufacturing and distributing methamphetamine, knowing and intending that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 812, 959(a), 960(a)(3), and 960(b)(1)(H). Count Five charged Abdalla with participating in a conspiracy to carry and use machineguns and destructive devices, during and in relation to, and in furtherance of, the drug-trafficking offenses charged in Counts One through Four, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(B)(ii), and 924(o). Count Six charged Abdalla with obstructing, influencing, and impeding an official proceeding, in violation of 18 U.S.C. § 1512(c).

Also on October 24, 2018, Abdalla pleaded guilty to each count of the Information pursuant to a written plea agreement with the Government.

On January 10, 2020, Judge Marrero sentenced Abdalla principally to a term of 276 months' imprisonment.

On March 17, 2021, this Court affirmed Abdalla's conviction and sentence.

3

On October 19, 2021, Abdalla moved to vacate his sentence under Section 2255. On July 21, 2022, the District Court denied the motion. On February 15, 2023, this Court granted a certificate of appealability with respect to whether (1) the District Court erred in denying Abdalla's ineffective assistance of counsel claim and (2) the District Court erred in declining to hold an evidentiary hearing or obtain a declaration or affidavit from Abdalla's counsel.

Abdalla is serving his sentence.

## Statement of Facts

### A.  The Offense Conduct

#### 1.  The Akasha Drug-Trafficking Organization

Abdalla was a high-ranking member of a drug-trafficking organization (the "Akasha DTO") led by his brother and co-defendant, Baktash Akasha Abdalla. (PSR ¶¶ 40, 46).[1] Baktash Akasha became the leader of the Akasha DTO in 2000, after his father was

---

[1]  "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Abdalla's sentencing; "Br." refers to Abdalla's brief in this appeal; "A." refers to the appendix to that brief; "Dkt." refers to an entry on the District Court's docket for this case; and "SA" refers to the supplemental appendix filed with this brief. Unless otherwise noted, case quotations omit internal quotation marks, citations, and alterations.

4

murdered. (*See* PSR ¶ 40). Under the leadership of Baktash Akasha and Abdalla (the "Akasha Brothers"), the Akasha DTO worked with other international drug traffickers to sell drugs around the world. (*See* PSR ¶¶ 46-48).

The Akasha DTO was involved in extensive criminal activity in Kenya and elsewhere, including trafficking in ton quantities of hashish and a schedule I controlled substance called methaqualone (more commonly known as "quaaludes" in the United States), and multi-hundred-kilogram quantities of cocaine, heroin, and methamphetamine. (*See* PSR ¶ 41). The Drug Enforcement Administration seized 99 kilograms of high-quality heroin and two kilograms of methamphetamine from the Akasha DTO, and 500 kilograms of heroin were in transit to the Akasha DTO at the time of Abdalla's arrest. (PSR ¶ 41). In addition, Abdalla and his co-defendants bribed and caused others to pay bribes to law enforcement throughout Africa, including in Kenya. (PSR ¶ 41). Finally, Abdalla participated in assaults, used firearms (including machineguns) to protect and grow his drug business, and was involved in the murder of at least one victim. (PSR ¶ 41).

## 2. The Akasha DTO's Efforts to Import Tons of Heroin and Methamphetamine into the United States

In March 2014, a DEA confidential source ("CS-1") approached Baktash Akasha and introduced him to a second DEA confidential source ("CS-2"), who, at the direction of the DEA, claimed to represent Colombian

drug traffickers who wanted to import high-quality heroin into the United States. (PSR ¶ 54). On March 28, 2014, members of the Akasha DTO met with CS-2 at a restaurant in Kenya. (PSR ¶ 55). At the meeting, Baktash Akasha told CS-2 that the Akasha DTO could provide CS-2 with "100 percent" pure heroin, and stated that he believed that CS-2 was the kind of "connection" that they had "been looking for about 20 years." (PSR ¶ 55). Baktash Akasha spoke of the Akasha DTO's scope, and assured CS-2 that the Akasha DTO could provide "the quantity [of heroin] you dream of, you and your people dream of." (PSR ¶ 55).

Shortly after the March 28, 2014 meeting, the Akasha Brothers met with co-defendant Vijaygiri Anandgiri Goswami to offer him the opportunity to join in their plan to import heroin into the United States. (PSR ¶ 57). At this meeting, Abdalla and one of his bodyguards were carrying pistols. (PSR ¶ 57). During the meeting, the Akasha Brothers told Goswami about their potential heroin deal, and noted that they were excited because of the high market price for heroin in the United States. (PSR ¶ 57). The Akasha Brothers pledged to contact multiple heroin suppliers to find a source of supply. (PSR ¶ 57). Goswami also agreed to contact a source, co-defendant Muhammad Asif Hafeez, about obtaining the heroin. (PSR ¶ 57). As part of their efforts to find a supplier, the Akasha Brothers traveled to Tanzania in May 2014 to meet with two heroin suppliers that they had previously mentioned to Goswami. (PSR ¶ 60). While there, Abdalla called Goswami to tell him that the two suppliers had shown the Akasha Brothers samples of

heroin but that neither supplier had enough heroin to send to the United States. (A. 280-81).

On September 21, 2014, the Akasha Brothers participated in another meeting with CS-2 and Goswami. During this meeting, among other things, Abdalla told CS-2 that he had spoken to his manufacturer, and been assured that the drugs were of the "best quality." (Dkt. 191 at 8). Abdalla also told CS-2 about how he used to steal ephedrine from government labs and had previously obtained "one thousand kilos" of drugs. (Dkt. 191 at 9). The next day, Abdalla traveled with CS-2 and others to Nairobi where they picked up two packages that contained just under a kilogram of methamphetamine. (PSR ¶ 71). Within weeks, a shipment of 99 kilograms of heroin arrived in Tanzania where it was stored at a house controlled by Hussein. (PSR ¶ 72). A one-kilogram sample of this heroin was then delivered to the Akasha Brothers at Baktash Akasha's house in Mombasa, and Abdalla and others, armed with pistols, drove the heroin to Nairobi. (PSR ¶ 73). On October 14, 2014, Abdalla provided this one-kilogram sample to CS-2. (PSR ¶ 73). On November 7, 2014, Abdalla delivered 98 kilograms of heroin to CS-2 in Nairobi. (PSR ¶ 75). Abdalla counted out the kilograms of heroin with CS-2, and CS-2 paid him approximately $25,000 to contribute to the transportation costs. (PSR ¶ 75). Abdalla also promised to provide CS-2 with five additional kilograms of methamphetamine, and CS-2 agreed to provide Abdalla with approximately $45,000 in exchange. (*See* PSR ¶ 75). Finally, on November 9, 2014, Abdalla delivered to CS-2 one kilogram of methamphetamine. (PSR ¶ 76). Kenyan

7

authorities arrested Abdalla and his co-defendants shortly after this delivery. (*See* PSR ¶ 42).

### 3. Abdalla's History of Violence

Abdalla owned and possessed several firearms and employed teams of armed security. The District Court relied upon many instances of violence in sentencing Abdalla, such as his brutal assaults on a rival drug trafficker named David Armstrong. (PSR ¶ 88). In 2014, Armstrong asked the Akasha Brothers and Goswami to help him with immigration issues he was having in Kenya in exchange for 500,000 methaqualone tablets. (PSR ¶ 88). The Akasha Brothers and Goswami paid $200,000 to another member of the Akasha family, who was supposed to bribe Kenyan officials to resolve Armstrong's immigration issues, but Armstrong fled Kenya without giving the Akasha Brothers the promised 500,000 tablets or repaying the $200,000. (PSR ¶ 89). After Armstrong fled, Baktash Akasha also told Goswami that he had heard that Armstrong was blaming him and Goswami for his immigration issues and was trying to have them killed. (PSR ¶ 88).

Later that year, Armstrong returned to Kenya. (PSR ¶ 90). Abdalla kidnapped Armstrong and brought him to Baktash Akasha's home, where Baktash Akasha beat Armstrong, pointed a gun at his head, and threatened to kill him. (PSR ¶¶ 90-92). Although the Akasha Brothers eventually released Armstrong, in September 2015, Abdalla learned that Armstrong was again at a hotel in Mombasa, where the Akasha Brothers and Goswami surprised him and

8

again beat him. (PSR ¶ 82). One of Goswami's phones was used to record parts of the assault, and photographs depict Abdalla and his brother as they wiped blood from Armstrong's face. (PSR ¶ 82). The Akasha Brothers both beat Armstrong, and Abdalla held a gun while pummelling him. (A. 313-14; PSR ¶ 93). As he beat Armstrong, Abdalla demanded to know why Armstrong had not repaid the Akasha Brothers and whether he had reported them to the DEA. (PSR ¶ 93).

Around this same time, a South Africa-based associate of Armstrong known as "Pinky" began to direct threats at the Akasha Brothers and Goswami. (PSR ¶ 94). As a result, Abdalla, his brother, and Goswami decided to have Pinky killed in public, to convey a message that the group would not tolerate such threats. (PSR ¶ 94). Abdalla participated in the initial meeting with Goswami and Baktash Akasha at which they decided to hire an assassin to kill Pinky. (Dkt. 180 at 59-66). Based on their agreement, Goswami coordinated Pinky's murder, and the assassin shot Pinky 32 times on a public street in South Africa. (PSR ¶ 94).

In the month between the agreement to kill Pinky and Pinky's murder, Abdalla often asked Goswami what was happening with the murder and "how fast" they could get it done. (Dkt. 180 at 62-63). Abdalla also told Goswami that he was "going to do whatever we have to do" and that he wanted to kill Pinky "as soon as possible." (Dkt. 180 at 63-64t). Abdalla later relied on his participation in this murder to threaten another drug trafficker known as "Clement." (Dkt. 180 at 66-67). Following a dispute between Clement and Abdalla regarding transportation of methaqualone, Abdalla

9

threatened Clement by telling him "look what hap-pened to Pinky, we killed him, we have him killed" and by warning that Clement was "next." (Dkt. 180 at 67).

### 4. Abdalla's Post-Arrest Campaign of Corruption

After the Kenyan authorities arrested Abdalla and his co-defendants, they engaged in a bribery campaign to delay proceedings, avoid extradition, and obstruct their prosecution in the United States. (PSR ¶¶ 80-82). The Akasha Brothers paid bribes to numerous individ-uals, including Kenyan law enforcement personnel, prosecutors, and at least three judges. (PSR ¶ 80). Through these bribes, the brothers first were able to obtain bail, which allowed them better access to their political network and drug trafficking proceeds so that they could continue to interfere with the efforts of the United States to bring them to the Southern District of New York. (PSR ¶ 81). Following their release on bail, Abdalla and his co-defendants obtained repeated adjournments of court dates in the hopes that it would weaken the Government's case due to a loss of wit-nesses and evidence. (PSR ¶ 81). Abdalla and his co-defendants also persuaded a judge in Kenya to issue an order directing U.S. personnel to appear in Kenya —after learning that U.S. prosecutors and agents would not do so—hoping that the anticipated non-com-pliance would create further, and perhaps indefinite, delay. (PSR ¶ 81). Abdalla was eventually expelled, arriving in the United States on January 30, 2017. (Dkt. 17).

10

### B.   The Conviction and Sentencing

After months of pre-trial litigation, on October 24, 2018, Abdalla waived indictment and pleaded guilty to the Information pursuant to a plea agreement with the Government (the "Plea Agreement"). (SA 1-9). Pursuant to the Plea Agreement, Abdalla stipulated, among other things, that (1) the offense involved more than 90 kilograms of heroin and more than 45 kilograms of methamphetamine; (2) Abdalla possessed a firearm during the offense; and (3) the offense involved between three and seven firearms, including a machine gun. (SA 4).

In the Plea Agreement, the parties stipulated to the application of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). Specifically, the parties agreed that the Offense Level was 43, and that Abdalla was in Criminal History Category I, resulting in a stipulated Guidelines sentence of life imprisonment, with a mandatory minimum term of 120 months' imprisonment. (SA 5-6).

In advance of sentencing, Abdalla (and his brother and co-defendant) disputed a number of facts contained in the initial draft of the Presentence Report, such as his involvement in the murder of Pinky and other acts of violence. Over the course of a two-day hearing, Goswami testified for the Government, describing Pinky's murder, and Abdalla's role in a string of drug-related assaults. (Dkt. 180, 181). Goswami also described aspects of Abdalla's drug trafficking and his bribery of Kenyan officials. At the conclusion of the hearing, Judge Marrero overruled the objections to the Presentence Report and found that Abdalla was

11

responsible for Pinky's murder and the other acts of violence described by Goswami. (Dkt. 181 at 245-46).

The Probation Office issued the final Presentence Report on June 26, 2019. Consistent with the Plea Agreement, the Presentence Report calculated an offense level of 43, a Criminal History Category of I, and a Guidelines recommendation of life imprisonment. (PSR ¶ 167). The Probation Office recognized that a "number of factors" contributed to Abdalla's criminal conduct, but found that the mitigating factors were outweighed by the serious nature of the offense and the risk of recidivism, and ultimately recommended a sentence of life imprisonment. (PSR pp. 37-39).

The District Court sentenced Abdalla on January 10, 2020. (Dkt. 198). Because of certain technical errors in Abdalla's guilty plea before a United States Magistrate Judge, the District Court first conducted a limited confirmation of Abdalla's desire to plead guilty. (SA 11-17). Among other things, Judge Marrero reviewed the charges and again confirmed that Abdalla wished to plead guilty to each count of the Information. (SA 11-17). At no time did Abdalla raise any issue with his plea or express any desire to withdraw his plea.

The District Court then proceeded to sentence Abdalla. First, the District Court confirmed that the parties had read the Presentence Report and that Abdalla did not have any unresolved objections to its contents. (SA 17-18). The Government argued for a Guidelines sentence of life imprisonment, emphasizing the quantity of drugs distributed by Abdalla, his violent conduct, and the obstruction of justice by

12

Abdalla and his co-defendants. (SA 20-27). Defense counsel argued for the mandatory minimum sentence, 120 months' imprisonment, seeking leniency based largely on Abdalla's culpability relative to his co-defendants, Abdalla's age at the time of the offense, and Abdalla's background. (SA 27-41). Abdalla then addressed the District Court. (SA 44-45). Abdalla took responsibility for his crimes, apologized to the District Court, and asked for mercy. (SA 44-45).

The District Court adopted the factual recitation and Guidelines calculation in the Presentence Report, resulting in a Guidelines recommendation of life imprisonment. (SA 45-46). After noting that the Probation Office also recommended a sentence of life imprisonment, Judge Marrero turned to the sentencing factors in 18 U.S.C. § 3553(a). (SA 46-48). Judge Marrero emphasized that Abdalla may have been relatively less culpable than his brother but that he still acted as "more than a willing lieutenant," and had minimized his own culpability in his sentencing arguments. (SA 48). Further, Judge Marrero also noted that the defendant was "by no means coerced into participation in this conspiracy." (SA 48). The District Court ultimately sentenced Abdalla principally to a below-Guidelines term of 276 months' imprisonment. (SA 47-48).

In his subsequent appeal, Abdalla claimed that he lacked fair notice that he could be prosecuted in the United States, and that his conduct lacked a sufficient jurisdictional nexus to the United States. (Dkt. 219). This Court rejected his arguments and affirmed the

13

judgment. *See United States v. Abdalla*, 839 App'x 656 (2d Cir. 2021).

## C.   The Section 2255 Motion

On October 19, 2021, Abdalla filed a motion under Section 2255. (A. 19-34). Abdalla argued that his prior counsel had performed ineffectively by failing to timely notify Abdalla of an earlier plea offer (the "Initial Plea Offer") that contained more favorable terms than the Plea Agreement. (A. 28-29). Abdalla further stated that had he known about the Initial Plea Offer, he would have accepted it. (A. 29-30).

Abdalla attached to his motion the Initial Plea Offer, which was signed by the Government and dated August 29, 2018—approximately two months earlier than the date on the Plea Agreement. (A. 40-46). Under the Initial Plea Offer, the Government offered a plea to two counts, carrying a maximum sentence of life imprisonment, a mandatory minimum sentence of ten years' imprisonment, and a recommended term of imprisonment under the Guidelines of 262 to 327 months. (A. 40-42). Abdalla also attached a sworn declaration, stating: "My former counsel did not timely convey the first formal plea offer from the United States. . . . Rather, they allowed this plea offer to expire without explaining the benefits and consequences of the offer or allowing me to consider it." (A. 38). Abdalla further averred that he would have accepted the Initial Plea Offer "just as readily" as he accepted the Plea Agreement. (A. 39).

In response, the Government argued that the District Court should deny the motion without a hearing

14

because Abdalla failed to establish that he was preju-
diced by any arguably deficient performance by coun-
sel. (Dkt. 233 at 1). In particular, Abdalla relied solely
on self-serving statements to show that he would have
accepted the Initial Plea Offer and had offered no ob-
jective evidence to that effect, and his statements were
otherwise belied by the record. (Dkt. 233 at 19-23). The
Government also argued that even if Abdalla could es-
tablish that he would have accepted the Initial Plea
Offer, there is no evidence that it would have resulted
in a lower sentence. (Dkt. 233 at 21-22). The Govern-
ment further stated that if the District Court chose to
evaluate counsel's performance—which the Govern-
ment did not believe was necessary—it should obtain
an affidavit from Abdalla's former attorney. (Dkt. 233
at 23-25).

In reply, Abdalla asserted that he was entitled to a
hearing, and that he had made a sufficient showing of
prejudice because had he accepted the Initial Plea Of-
fer "his sentence . . . would have been less severe and
he would have been convicted of fewer and less serious
counts." (A. 61-63).

The District Court denied the Section 2255 motion
in a written order. (A. 67-78). Judge Marrero noted
that the evidence offered by Abdalla in support of his
motion was "sparse." (A. 73-74). Judge Marrero then
explained that although a hearing with testimony or a
declaration from Abdalla's counsel "may provide fur-
ther evidence" regarding counsel's performance, it
would be "futile" because Abdalla had not shown prej-
udice. (A. 74). Judge Marrero reasoned that although
the Guidelines ranges in the Initial Plea Offer and the

15

Plea Agreement differed, he had imposed a sentence within the Guidelines range in the Initial Plea Offer. (A. 75). The District Court further found that Abdalla had failed to "establish a reasonable probability that the sentence he received was higher as a result of pleading guilty to additional charges." (A. 76). Judge Marrero explained that he had sentenced Abdalla to concurrent terms of imprisonment on all counts of conviction, and two of those counts were also counts in the Initial Plea Offer, meaning that the number of counts in the Plea Agreement had no effect on Abdalla's sentence. (A. 76-77). Judge Marrero also explained that he had sentenced Abdalla "primarily based on the Section 3553 factors and the circumstances of the offense," none of which would have changed if Abdalla had accepted the Initial Plea Offer. (A. 76-77). Because Judge Marrero would have weighed the relevant factors similarly under the Initial Plea Offer, he found that Abdalla had shown no prejudice from instead being sentenced under the Plea Agreement. (A. 77 (citing *United States v. Dye*, 638 F. App'x 117, 123 (3d Cir. 2015) ("Given the district court's care and explanation of the sentence that was imposed, Dye cannot establish that a guilty plea pursuant to the March 2009 plea offer would have had a reasonable probability of achieving a different sentence."))).

16

**A R G U M E N T**

**POINT I**

**The District Court Correctly Determined that
Abdalla Was Not Prejudiced**

**A.  Applicable Law**

**1.  Standard of Review**

When reviewing a district court's denial of relief under Section 2255, this Court reviews legal conclusions de novo while deferring to the district court's findings of fact unless clearly erroneous. *Rivera v. United States*, 716 F.3d 685, 687 (2d Cir. 2013). Ineffective assistance claims present mixed questions of law and fact, which are reviewed de novo. *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011). This Court may affirm a district court's decision on any ground appearing in the record, including one "different from that adopted by the district court." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).

**2.  Ineffective Assistance of Counsel Claims
Generally**

To prevail on a claim of ineffective assistance of counsel, a defendant must both (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" arising from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). The burden is on the defendant to establish both elements. *Id.*

17

at 687. "This test is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on it." *Parisi v. United States*, 529 F.3d 134, 140-41 (2d Cir. 2008).

To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Showing merely that counsel's errors had "some conceivable effect" on the result will not suffice because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. "The object of an ineffectiveness claim is not to grade counsel's performance," and so "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697; *see, e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (declining to address alleged deficiencies of counsel where overwhelming evidence of defendant's guilt precluded finding of prejudice); *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [appellant], there is little reason to believe that alternative counsel would have fared any better."); *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir. 1990) (affirming district court's rejection of Sixth Amendment claim despite deficient performance of counsel "given the overwhelming evidence" of defendant's guilt).

18

### 3. Ineffective Assistance of Counsel Claims Regarding Plea Agreements

A defendant is entitled to the effective assistance of counsel in connection with plea negotiations. *See Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012); *Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000). "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy*, 208 F.3d at 45; *accord Missouri v. Frye*, 566 U.S. 134, 145-46 (2012) ("defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused"). An attorney's failure to communicate a plea offer to his client, or to advise his client adequately about the decision to plead guilty, may constitute deficient performance. *See, e.g.*, *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996).

Even if the defendant can prove that his attorney failed to provide adequate advice about a plea offer, the defendant must still "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. That is, he must prove that there is a reasonable probability that, but for counsel's errors: (i) he would have accepted the plea offer; (ii) the plea offer would not have been withdrawn by the prosecution in light of intervening circumstances; (iii) the District Court would have accepted the terms of the plea offer; and (iv) the "conviction or

sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Lafler*, 566 U.S. at 164-65.

## B. Discussion

The District Court correctly denied Abdalla's Section 2255 motion without a hearing. While, as Judge Marrero recognized, a factual hearing could have provided additional information concerning Abdalla's counsel's performance, it was unnecessary because Abdalla's arguments failed on the prejudice prong. *Strickland*, 466 U.S. at 697 (noting that a court need not reach performance prong if a claim can be resolved through an examination of "the prejudice suffered by the defendant as a result of the alleged deficiencies"); *Farrington v. Senkowski*, 214 F.3d 237, 242 (2d Cir. 2000) (resolving ineffective assistance claim on prejudice prong alone).

Abdalla fails to meet his burden of demonstrating that he would have accepted the Initial Plea Offer. *See Lafler*, 566 U.S. at 164-65. Although Abdalla declares that he would have accepted the offer, this Court has repeatedly found such self-serving assertions insufficient if not corroborated by "objective evidence." *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (holding that a petitioner needed to supply "objective evidence" that he would have accepted a plea offer to support claim that he was prejudiced by ineffective assistance); *Puglisi v. United States*, 586 F.3d 209, 217 (2d Cir. 2009) (affirming denial of petition without an evidentiary hearing on the grounds that the petitioner

20

"failed to proffer any objective evidence that he would have accepted the plea offer had he received adequate pretrial counseling").

For example, this Court has noted that a defendant's *post hoc* assertion that he would have accepted a plea offer can be corroborated by a significant sentencing disparity between the Guidelines range in the offer and the ultimate sentence. *See Raysor*, 647 F.3d at 495. But here, as Judge Marrero noted, Abdalla received a sentence within the Guidelines range in the Initial Plea Offer. (A. 75). Nor does Abdalla offer any other evidence, such as communications with counsel where he expressed a desire to enter a plea or complaints to counsel after the plea expired. In the absence of such "contemporaneous evidence to substantiate a defendant's expressed preferences," the District Court did not err in rejecting Abdalla's "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017); *see also United States v. Bent*, 654 F. App'x 11, 13 (2d Cir. 2016) (affirming denial of petition without evidentiary hearing, because the petitioner failed to demonstrate prejudice resulting from his counsel not showing him a draft plea agreement, "as he could not show that . . . there was a reasonable probability that he would have accepted the plea offer")

Contrary to Abdalla's claims, that he accepted the Plea Agreement does not suggest—much less prove— that he would have accepted the Initial Plea Offer. In the two months between the Initial Plea Offer and the Plea Agreement, events made it much clearer to

21

Abdalla that he would be convicted at trial. Among other things, the District Court denied Abdalla's motion to dismiss the Indictment (Dkt. 83); the Government produced voluminous records of its meetings with witnesses, revealing the overwhelming evidence against him (Dkt. 131 at 5, 8, 9); the Government filed motions *in limine* outlining its trial presentation (Dkt. 90); the District Court denied Abdalla's motions *in limine* (Dkt. 121); and the District Court granted substantial portions of the Government's motions *in limine*, including motions to admit evidence regarding the Akasha Brothers' participation in murder, kidnapping, and assault (Dkt. 135). Thus, the fact that Abdalla accepted the Plea Agreement after all these unfavorable developments does not suggest that he would have accepted the Initial Plea Offer before those developments. *See Frye*, 566 U.S. at 150 ("[R]evelations between plea offers about the strength of the prosecution's case may make a late decision to plead guilty insufficient to demonstrate, without further evidence, that the defendant would have pleaded guilty to an earlier, more generous plea offer if his counsel had reported it to him.").

Moreover, even if Abdalla had proven that he would have accepted the Initial Plea Offer, he has failed to show that his sentence "under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Lafler*, 566 U.S. at 164-65. As Judge Marrero explained, his sentence would not have changed had Abdalla accepted the Initial Plea Offer rather than the Plea Agreement. (A. 75-77). Judge Marrero is plainly in the best position to know whether the difference in the two agreements

22

would have affected the sentence he imposed. *See United States v. McCoy*, 707 F.3d 184, 189-90 (2d Cir. 2023) (affirming district court's finding of no prejudice where district court "made it exceedingly clear" that allegedly ineffective performance did not affect its sentence). And his conclusion that differences between the offers would have made no difference in Abdalla's sentence is confirmed by both the transcript of the original sentencing, in which Judge Marrero relied on the Section 3553(a) factors, as well as the fact that the sentence Judge Marrero imposed is within the Guidelines range of the Initial Plea Offer. *See United States v. Dye*, 638 F. App'x 117, 122-23 (3d Cir. 2015) (finding defendant failed to show prejudice where ultimate sentence was within Guidelines range of plea offer he claimed counsel failed to communicate). Abdalla has thus not shown a "reasonable probability that his sentence would have been different" under the Initial Plea Offer. *United States v. Workman*, 110 F.3d 915, 920 (2d Cir. 1997).

Abdalla's contrary argument relies on a misreading of *Frye*. He claims that under *Frye*, it suffices that the stipulated Guidelines range in the Plea Agreement was higher than in the Initial Plea Offer. (Br. 11-13). But *Frye* held that to demonstrate prejudice, "it is necessary to show a reasonable probability that *the end result* of the criminal process would have been more favorable." 566 U.S. at 147 (emphasis added). In *Frye*, making that determination required a remand to the state courts, to determine (among other things) whether the defendant would have in fact received one of the two determinate sentences he was apparently promised in the initial, lapsed plea offers. *Id*. at 150-

23

51. Here, the court that determined Abdalla's sentence —the District Court—has already made plain that "the end result," *id.* at 147, was not affected by any failure to communicate the Initial Plea Offer, and so Abdalla's claim fails under *Frye*.

## POINT II

### The District Court Did Not Abuse Its Discretion in Declining to Hold a Hearing

#### A. Applicable Law

This Court reviews a district court's decision whether to hold a hearing on claims under Section 2255 for abuse of discretion. *Chang v. United States*, 250 F.3d 79, 82 (2d Cir. 2001). In particular, "when the judge who tried the underlying proceedings also presides over a Section 2255 motion, a full-blown evidentiary hearing may not be necessary." *Raysor*, 647 F.3d at 494.

#### B. Discussion

Abdalla's claim that he was entitled to a hearing is without support in law or fact. To be sure, the District Court could not have granted his motion without allowing his counsel to be heard, at least by affidavit if not at a hearing. *See United States v. Galanis*, 759 F. App'x 88, 93 (2d Cir. 2019) (allegedly ineffective attorneys "should have an opportunity to be heard" before district court deems them ineffective). And a hearing may well have been required to deny the motion on the performance prong of *Strickland*, given Abdalla's sworn allegation that his counsel failed to

24

communicate the Initial Plea Offer. But Judge Marrero resolved Abdalla's motion by finding he had not shown prejudice from any such failure. (A. 75-77). And district courts may deny Section 2255 motions alleging ineffective assistance of counsel without a hearing where the record makes clear that the defendant was not prejudiced by the allegedly deficient performance of his counsel. *See, e.g, Milios v. United States*, 813 F. App'x 646, 648 (2d Cir. 2020); *Phillip v. United States*, 804 F. App'x 91, 94 (2d Cir. 2020).

For similar reasons, it was within the District Court's discretion not to require Abdalla's counsel to submit an affidavit. The use of affidavits from prior counsel provides an alternative means "to expand the record without conducting a full-blown testimonial hearing." *Chang*, 250 F.3d at 86 (citing *Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977)). Whether to utilize that method is also within district courts' discretion. *Id.* And because Judge Marrero could conclude that even assuming counsel had failed to communicate the Initial Plea Offer, that failure did not prejudice Abdalla, Judge Marrero was within his discretion to proceed without an affidavit. *See, e.g.*, *Puglisi*, 586 F.3d at 215-18 (affirming denial of ineffective assistance claim based on failure to show prejudice without a hearing or obtaining affidavit from counsel).

In arguing that a hearing was required, Abdalla primarily cites *Armienti v. United States*, 234 F.3d 820, 823, 825 (2d Cir. 2000). (Br. 14-16). But in *Armienti* this Court found it necessary "to hold an evidentiary hearing to determine whether there was an actual conflict of interest and, if so, whether the

25

conflict adversely affected [the defendant's] lawyer's performance." 234 F.3d at 825. It did so because those "issues implicate actions taken by counsel outside the presence of the trial judge and therefore could not ordinarily be resolved by him without such a hearing." *Id.* By contrast, Judge Marrero was plainly present for and knowledgeable about how he determined the appropriate sentence, and was thus able to resolve the question of prejudice without need for a hearing. *See Puglisi*, 586 F.3d at 214-15 (noting that where district court presided over the original proceedings, a hearing may be particularly unnecessary given the judge's knowledge of the case).

## CONCLUSION

**The District Court's order denying the Section 2255 motion should be affirmed.**

Dated:      New York, New York
               August 4, 2023

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

JASON RICHMAN,
HAGAN SCOTTEN,
     *Assistant United States Attorneys,*
               *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 5,953 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*